**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ------------------------------------------------------- x | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 07-10110 (PJW) |
| MEDIFACTS INTERNATIONAL, INC., | : | |
| | : | |
| Debtor. | : | |
| | : | |
| ------------------------------------------------------- x | | |

**MOTION OF DRS. BRUCE GARRETT AND SANDRA GARRETT FOR A DETERMINATION THAT THEY ARE QUALIFIED BIDDERS AND MADE A QUALIFIED BID FOR THE CRO ASSETS UNDER THE BID PROCEDURES APPROVED BY THE COURT AND THAT THE FULL AMOUNT OF THE $2 MILLION CASH DEPOSIT THAT THEY PAID TO THE DEBTOR SHOULD BE CREDITED TOWARD THEIR BID**

Drs. Bruce and Sandra Garrett (the "Garretts"), by and through their undersigned counsel, hereby move (the "Motion") for entry of an order: (i) determining that (a) they are Qualified Bidders who have timely submitted a Qualified Bid to purchase the CRO Assets of Medifacts International, Inc. ("Medifacts," the "Company" or the "Debtor"), (b) their Qualified Bid should be valued in an amount not less than $2,400,000 and (c) they are entitled to apply the full amount of the $2,000,000 previously transferred to the Debtor in support of their Qualified Bid (the "Escrow Funds"); (ii) directing the Debtor to allow the Garretts to bid at the Auction for the CRO Assets; and (iii) granting related relief.[1] In support of the Motion, the Garretts respectfully state as follows:

---

[1] Capitalized times not otherwise defined herein shall have the meanings ascribed to such terms in the Order Approving Debtor's Motion for Order (A) Approving Sale Procedures; (B) Approving Form and Manner of Notice of the Auction; (C) Scheduling a Hearing to Consider the Sale of the Debtor's Clinical Research Services Division; and (D) Granting Related Relief, dated February 15, 2007 (D.I. 131) (the "Sale Procedures Order"), and the Sale Procedures annexed as Exhibit 1 to the Sale Procedures Order (the "Sale Procedures").

PRELIMINARY STATEMENT

Pursuant to the bid procedures approved by this Court, on February 26, 2007, Drs. Bruce and Sandra Garrett submitted a bid to purchase the CRO assets of Medifacts for $2,400,000, consisting of $2 million previously paid by the Garretts to Medifacts toward the purchase of the CRO assets plus an additional $400,000 in cash payable upon closing.[2] The Garretts' offer also included a provision increasing the overall consideration to $2,850,000 in the event that the Company included the plasma study contract with Arthera Pharmaceuticals in the contracts assumed by buyer.

On February 27, 2007, Medifacts informed the Garretts that it would not even consider their bid because they were allegedly not a Qualified Bidder for the CRO assets and had not submitted a Qualified Bid. In doing so, Medifacts refused to credit toward the Garretts' bid the $2 million that the Garretts had paid to Medifacts in December, 2006. Medifacts' absolute refusal to grant the Garretts any credit for the $2 million in cash that they paid to Medifacts towards the purchase of the CRO assets not only violates all principles of equity and fairness, but is simply the latest in a litany of violations by Medifacts of its promise to credit the $2.0 million

---

[2] For a bid to be a Qualified Bid pursuant to the procedures approved by the Court, it must contain only: "(a) an unexecuted "clean" version of a sale agreement, together with a blackline to reflect the changes from the sale agreement provided by the Seller; (b) a letter setting forth the identity of the bidder (including an authorized representative thereof), such bidder's counsel, and contact information for such bidder, its authorized representative and its counsel; (c) a proposal to purchase substantially all of the CRO Assets or a specific geographic location with respect to the CRO Assets, whether in a separate transaction or series of transactions; (d) written evidence of a commitment for financing or other evidence of the bidder's financial ability to consummate the sale (in a form satisfactory to Seller in its discretion; (e) written acknowledgement that such bid is unconditional and not contingent upon any event, including, without limitation, any due diligence investigation, the receipt of financing or any further bidding approval; (f) written evidence that the bidder has the requisite corporate or similar authority to consummate the investment or sale; (g) written acknowledgment that such proposal is irrevocable until the effective date of a transaction implementing the Successful bid (as herein defined); (h) an earnest money deposit in the amount of $250,000 (each as "Good Faith Deposit"); and (i) such other information as the Seller may request. The Garretts' bid contains each of these required items.

2

towards the purchase of the CRO Assets and to act in good faith to consummate the expedited closing of the transaction with the Garretts.

As set forth below, Medifacts and its management, preferred stockholders, and advisors did not act in good faith to close the transaction and, on the Closing Date, refused to consummate the transaction pursuant to the terms of the letter of intent. Even more egregious given its promise to act in good faith, a mere six minutes after the scheduled closing time, Medifacts sent an email to the Garretts informing them that their $2 million had been forfeited and Medifacts had no further obligation to them. Thereafter, Medifacts attempted improperly to use the Garretts' $2.0 million as leverage to force the Garretts to give up valuable shareholder rights. Because the $2 million was paid to Medifacts toward the acquisition of the CRO assets and Medifacts breached its obligation to act in good faith to close the transaction, the Garretts should be permitted to bid on the CRO assets using the $2.0 million that they have already paid and the Garretts bid should be deemed a Qualified Bid under the bid procedures approved by the Court.

## BACKGROUND

After determining that it was in the best interests of the Medifacts to pursue a potential sale of the CRO assets, Medifacts board retained Crosstree Capital Partners, Inc. ("Crosstree") in November 2006 to solicit potential bidders. The process ultimately resulted in the submission of three bids for the CRO assets: (1) Dr. Garrett; (2) Clinical Systems Inc. ("Clinsys") and (3) Veeda Clinical Research ("Veeda"). At a meeting held on December 23, 2006, the Medifacts board considered the three offers and determined that Dr. Bruce Garrett's offer provided the greatest economic value to Medifacts. The board's determination was based upon a financial analysis of the bids that was prepared by Crosstree. According to the Crosstree

analysis, the Garretts' offer would provide a total economic value of $4,008,000, Veeda's offer would provide a total economic value of $3,695,000 and Clinsys' offer would provide a total economic value of $3,075,000:

Economic Considerations

| | Cash @ Close | Seller Note | Assumed Liabilities | Additional Severance Forgiveness | Assumed Assets | Required Cash | Lease Deposit Repayment | Cost of Time to Close | Total Economic Value | Severance Escrow | Net Gross Cash @ Close |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Clinsys (a) | 3,900 | | 1,373 | - | (2,264) | - | 216 | (150) | **3,075** | 400 | 3,500 |
| Veeda(b) | 4,000 | | 2,004 | - | (2,375) | - | 216 | (150) | **3,695** | 400 | 3,600 |
| Garrett(c) | 2,000 | 1,500 | 2,196 | 722 | (2,375) | - | 40 | (75) | **4,008** | - | 2,000 |

While the Board determined that the Garrett proposal offered the greatest economic value, the board decided to go forward with that superior offer only if Dr. Bruce Garrett paid $2 million toward the purchase price on the next business day (December 26, 2006) and his wife, Dr. Sandra Garrett, pledged her majority common stock holding as security until replaced by the $2 million.[3]  Moreover, the Board determined to require the Garretts to accept the demand for $2 million by 5:00 p.m. on that date and, to the extent the demand was not accepted to by 5:00 p.m. on December 23, 2006, the Board authorized the signing of a letter of intent with one of the lesser bidders.

At approximately 4:00 p.m. on December 23 (one hour before they were required to sign), Shane Senior of Crosstree sent Dr. Bruce Garrett the letter of intent required by the Medifacts board.  (Exhibit A)  The December 23 letter specifically incorporated the terms articulated in prior letters from Dr. Bruce Garrett to Medifacts (taken together, the letters are referred to herein as the "Letter of Intent").  More importantly, the letter included, among other things, the demand that the Garretts agree to provide $2.0 million in cash to Medifacts to the secure the deal.  Medifacts informed the Garretts that they had only until 5:00 p.m. to agree to provide the $2.0 million or the Company would enter into a letter of intent with Veeda.  Without

---

[3]     In addition, apparently at the behest of the preferred stockholders and their designees, the Board required the Garretts to relinquish certain of their rights as the majority common shareholders as a requirement for Medifacts to go forward with their superior economic bid.

the benefit of time to consult counsel, the Garretts agreed to provide the $2.0 million based upon their understanding that the parties had agreed upon all of the principal terms for the acquisition and in reliance on Medifacts' express representation in the Letter of Intent that it would act in good faith to consummate the sale of the CRO assets on or before the January 2, 2007 closing date (the "Closing Date") pursuant to those terms.

However, almost immediately after execution of the Letter of Intent and payment of the $2 million, Medifacts and its officers, advisors and preferred shareholders began to violate the promise to act in good faith to consummate the transaction. Following the execution of the Letter of Intent and payment of the Escrow Funds, Medifacts was unable to provide the Garretts with the most basic financial due diligence necessary to close the transaction, purportedly because it was the holiday season. Although he was present during this crucial time and understood Medifact's promise to act in good faith to consummate the transaction, Dr. Woehler, Medifact's CEO, stated that he was not willing to "be the admin" for the Garretts' accountant and personally gather and photocopy the documents. In addition, Medifacts' foreign subsidiaries were also unable to provide the information necessary to consummate the sale of the subsidiaries to the Garretts until after January 2, 2007 because of the holiday season.

Undaunted by the lack of cooperation and motivated by their genuine interest in acquiring the CRO assets and continuing the business that they had spent their professional lives building, the Garretts and their attorneys repeatedly requested that the Closing Date be extended by a few days to allow the necessary acts to be completed and the transaction to go forward. In response, Medifacts stated that it would only extend the closing in exchange for the Garretts agreement to relinquish additional corporate governance rights. Medifacts refusal to extend the Closing Date was particularly egregious since as of the date of the scheduled closing, Medifacts

still had been unable to produce the schedules and foreign subsidiary documents necessary for the closing.

Notwithstanding Medifacts' inability to provide necessary information and Medifacts improper demands that the Garretts give up additional governance rights, on January 1, 2007, the Garretts' attorneys sent to Medifacts and its advisors a set of documents that were consistent with the Letter of Intent and could serve as the basis for the closing on January 2, 2007. On the morning of January 2, 2007, the Garretts, through their attorney, reaffirmed their willingness to close on the sale on the most recently circulated documents, provided that Medifacts could produce the required schedules and necessary documents to close on the foreign subsidiaries.

However, Medifacts refused to consummate the transaction. Even more troubling, at 5:06 p.m. on January 2, 2007, a mere six minutes after the time for the Closing, Dr. Woehler sent to Dr. Bruce Garrett an email stating that, because the Transaction was not consummated on or before 5:00 p.m., the Garretts' $2 million was forfeited and the Company had no further obligation to the Garretts. *See* Exhibit B hereto. Even putting aside the question of fault for not making the 5:00 p.m. deadline contemplated by the Letter of Intent, given the difficulties created by the time constraints and the holiday season, Medifacts' obligation to act in good faith to close the sale required, *at the very least*, Dr. Woehler and Medifacts to make some additional effort and time to determine if the parties could consummate the transaction before unilaterally declaring that the Garretts' $2.0 million had been forfeited.[4]

---

[4] Medifacts has attempted to justify its improper conduct and failure to act in good faith to close by claiming that the Garretts were unable to provide a letter of credit sufficient to cover the lease obligations they would be assuming through the purchase of the CRO assets. However, Medifacts' position that the Garretts were required to provide a letter of credit sufficient to cover the full term of each of the leases simply ignored that the terms of the leases themselves provide that the Garretts would, at most, be liable for one year's rent in the event of a default. Indeed, the pretextual nature of Medifacts' refusal to close was clearly

6

On January 3, 2007, Dr. Bruce Garrett sent Medifacts' CEO a letter, informing him that, although Medifacts had failed to honor its obligations under the Letter of Intent, the Garretts nevertheless remained ready and willing to consummate the transaction to acquire the CRO assets. Medifacts' CEO responded by refusing to return the Garretts' $2 million and by stating that Medifacts would only go forward with the sale if Dr. Garrett agreed to accept a new set of terms. *See* Exhibit C hereto. Medifacts' response was nothing more than an improper attempt to hold the Garretts' $2 million hostage unless the Garretts agreed to change the terms of the deal that the parties had previously agreed upon in the Letter of Intent by increasing the purchase price or giving up their voting rights as common stockholders or their common stock entirely. Understandably, the Garretts refused to allow Medifacts and its preferred shareholders to abuse the $2 million to force the Garretts to give up rights.[5]

Since that time, Medifacts has continued to refuse to return the Garretts' $2 million or to go forward with a sale of the CRO assets to them. As a result, the Garretts were forced to file a complaint in the Court of Chancery to compel Medifacts to comply with its obligation under the Letter of Intent or to return their $2 million. In response to that filing, the defendants in the Chancery Court case caused Medifacts to file the present bankruptcy case to avoid resolution of the Garretts' claims on the merits by the Court of Chancery. Now, even though the $2 million was expressly paid toward the acquisition of the CRO assets, Medifacts refuses to provide any credit for that $2 million against the Garretts' bid.

---

demonstrated when Medifacts offered two days after the Closing Date to give up its letter of credit demand if Dr. Garrett gave up her voting rights.

[5] Although the issue does not need to be decided on the present motion, it appears in retrospect that the actions of the officers, advisors and preferred shareholders with respect to the Garrett bid have been motivated all along by a self-serving desire of the preferred shareholders to compel Dr. Sandra Garrett to relinquish the rights of the common shareholders under the corporate governance documents and give up her rights as a majority common shareholder.

## LEGAL ARGUMENT

What the Garretts feared has come to pass. The Debtor – without legal justification or valid cause – has denied them the opportunity to participate at the Auction for the CRO Assets, despite the fact that the Garretts have already transferred $2 million in Escrow Funds to the Debtor as a demonstration of their commitment, wiliness and ability to proceed with a transaction to acquire the CRO Assets. The decision of those controlling the Debtor to allow their animosity toward the Garretts to trump their obligations as fiduciaries for the Debtor's creditors and stakeholders to ensure a vibrant auction to maximize the value of the Debtor's estate cannot be countenanced.

The Garretts have taken all of the steps required of them under the Sale Procedures to submit a Qualified Bid and be entitled to the status of Qualified Bidders. The Debtor, however, have refused to recognize the Garretts' Qualified Bid, apparently maintaining that the Garretts have not supplied "written evidence of a commitment for financing or other evidence of [their] financial ability to consummate the sale" and have not supplied "an earnest money deposit in the amount of $250,000." This position, in turn, appears solely predicated on the Debtor's wrongful refusal to consider the $2 million in Escrow Funds already in their possession in connection with the Garrets' original offer to purchase the CRO Assets.

The Debtor cannot prevail on its position that the Escrow Funds cannot be utilized by the Garrets to submit a Qualified Bid and participate at the Auction unless the Debtors can establish that Escrow Funds were, in fact, forfeited to the Debtors and are now property of the Debtor's estate in which only the Debtor has a legal and equitable interest. This the Debtors cannot do. The intent of the parties as expressed through the Letter of Intent, the Debtor's bad

faith and wrongful conduct and the sheer inequity of subjecting the Garretts to such a forfeiture preclude a court of equity from sanctioning such a result.

> Section 541(d) of the Bankruptcy Code provides:
>
> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). "Subsection (d) re-emphasizes the provision of section 541(a)(1) that the estate is to be compromises of all legal or equitable interests of the debtor in property as of the commencement of the case. It also reiterates the general principle that an interest that is limited in the hands of the debtor is equally limited in the hands of the estate, and therefore, where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest in the property." 5 Alan N. Resnick, COLLIER ON BANKRUPTCY ¶ 541.28 at 541-112 (15th ed. rev. 2006).

As a threshold matter, it is clear that the express intent of the parties here was to create an escrow arrangement pursuant to which the Debtor would be entitled to the Escrow Funds only if certain conditions were met. When, as is the case here, the intended result was to create an escrow arrangement pursuant to which the debtor has custody of property, such property cannot be included in the debtor's estate unless and until the governing conditions are satisfied. *See, e.g., Gulf Petrol., S.A. v. Collazo,* 316 F.2d 257, 263 (1st Cir. 1963) ("Courts of bankruptcy recognize that money held in escrow is not property which vests in the trustee in bankruptcy . . . ."); *In re Hildebrand,* 205 B.R. 278, 285 (Bankr. D. Colo. 1997) (stating that "[t]here can be little doubt that the escrow arrangement created a trust relationship" in course of holding that deposit provided by purchaser of debtor's assets was not estate property); *Old*

9

*Republic Nat'l Tit. Ins. Co. v. Tyler (In re Dameron),* 206 B.R. 394, 402 (Bankr. E.D. Va. 1997) ("In bankruptcy, funds held by a debtor as a depositary of an escrow may be excluded from the bankruptcy estate."); *Shron v. M & G Promo Serv., Ltd. (In re Sicari),* 144 B.R. 656, 662 (Bankr. S.D.N.Y. 1992) ("[O]nce funds were deposited in an escrow, equitable principles removed the funds from the debtor's estate."); *In re Portjeff Dev't Corp.,* 128 B.R. 38, 43 (Bankr. E.D.N.Y. 1991) ("The deposits with the Escrow Agent by each of the purchasers . . . were trust funds and, therefore, never became the property of the debtor.").

The December 23, 2006 amendment to the Letter of Intent references the Escrow Funds as "a non-refundable ***deposit*** to the Company ***to secure your obligations*** to purchase the CRO Business as set forth in the December 15, 2006 Letter, as amended . . . ." (emphasis added). The December 23rd letter further provides that if the "purchase of the CRO Business is not consummated . . . on or before 5pm EST on January 2, 2007 . . . , the Deposit shall be forfeited and ***shall become the sole property of the Company.***" (emphasis added). Finally, and most importantly, the December 23 Letter expressly obligated Medifacts to act in good faith to consummate the transaction.

The plain meaning of this language is that the Escrow Funds were intended only as a "deposit" and that the Debtor would acquire no interest in the Escrow Funds unless and until there was a failure to close by the Garretts that violated the terms of the Letter of Intent. Only then would the Escrow Funds become the property of the Debtor. As discussed above, however, the Debtor, not the Garretts, rendered it impossible to complete documentation of a Definitive Agreement (as defined in the Letter of Intent) and to timely consummate the transaction.

Moreover, even assuming the absence of an express agreement that the Escrow Funds were to be held in escrow, the circumstances present here warrant the imposition of a

constructive trust to address the injustice to the Garretts that would result were the Debtor permitted to retain the Escrow Funds and be unjustly enriched thereby. As recently stated by this Court, "[t]he Third Circuit has held that . . . section [541(d)] serves to exclude from the debtor's bankruptcy estate any of the debtor's property held in constructive trust for another party at the time of a bankruptcy filing." *Claybrook v. Consolidated Foods, Inc. (In re Bake-Line Group, LLC),* ---- B.R. ----, 2007 WL 329695 at *4 (Bankr. D. Del. Feb. 5, 2007) (citing *Official Comm. Of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys. (In re Columbia Gas Sys., Inc.),* 997 F.2d 1039, 1059 (3d Cir. 1993)). Accordingly, the existence of such a constructive trust prevents the Debtor from including the Escrow Funds within its estate and limiting the Garretts' ability to use them in connection with their bid.

Maryland law, which governs the interpretation of the Letter of Intent and the parties' rights thereunder, is well developed in this area and makes liberal use of constructive trusts, resulting trusts and other implied trusts to correct injustices.[6] Under Maryland law, "[i]mplied trusts may be either resulting or constructive trusts."[7] *Siemiesz v. Amend,* 206 A.2d 723, 725 (Md. 1965). As explained by Maryland's highest court,

> [a] constructive trust is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who I good conscience should reap the benefits of the possession of said property. The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it.

---

[6] Since the underlying claims here are based on state law, state law, rather than federal common law, controls whether or not a constructive trust is present. *See Fluor Enter., Inc. v. Orion Refining Corp. (In re Orion Refining Corp.),* 341 B.R. 476, 483 (Bankr. D. Del. 2006).

[7] "A resulting trust arises upon the presumed intention of the parties where the terms of the disposition or accompanying fact establish that beneficial interest is not to go with legal title." *Siemiesz,* 206 A.2d at 725. As discussed above, the facts present here also would support the finding of a resulting trust under Maryland law.

11

*Wimmer v. Wimmer,* 414 A.2d 1254, 1258 (Md. 1980). *See also Grimes v. Grimes,* 40 A.2d 58, (Md. 1944) (same). "The purpose of the remedy is to prevent the unjust enrichment of the holder of the property." *Wimmer,* 414 A.2d at 1258.

Consistent with the view articulated above, and unlike some other jurisdictions, Maryland courts do not require proof of fraud to establish a constructive trust. Rather, "[i]t is enough that the 'conscience' of a court of equity would be traumatized if the legal title holder were allowed to deprive the beneficial owner of that which in good conscience belongs to the beneficial owner." *Hartsock v. Strong,* 318 A.2d 237, 241 (Md. App. 1974). *See also Levin v. Levin,* 405 A.2d 770, 778 (Md. App. 1979) ("[I]t is sufficient if the conscience of the chancellor requires granting such relief."). Indeed, it is "well-settled in Maryland that a constructive trust will be imposed to avoid unjust enrichment arising out of mistake in the absence of fraud, the violation of any fiduciary duty or any other wrongdoing." *Maryland Nat'l Bank v. Tower,* 374 F.2d 381, 383-84 (4th Cir. 1967). A constructive trust may arise simply as a result of a person's "failure or refusal to that which he ought to have done . . . ." *Hartsock,* 318 A.2d at 241.

As discussed above, the Debtor's course of conduct here is clearly that which should "traumatize the conscience" of the Court. The Debtor failed and refused to negotiate in good faith to reach a Definitive Agreement and to consummate the transaction by the Closing Date after inducing the Garretts to transfer $2 million into the Debtor's custody. Then, merely minutes after the 5 p.m. deadline passed, the Debtor purported to seize the Escrow Funds and refused to return such funds unless the Garretts acceded to Medifacts' improper attempt to compel them to give up valuable rights. Now, Medifacts refuses to credit the Escrow Funds that were expressly paid toward the acquisition of the CRO Assets to be used for the Garretts' bid.

## RELIEF REQUESTED[8]

The Garretts seek only that which has been wrongfully denied to them by the Debtor – the opportunity to participate at the Auction for the CRO Assets on equal footing with other Qualified Bidders. To this end, the Garretts respectfully request the entry of an order: (i) determining that (a) they are Qualified Bidders who have timely submitted a Qualified Bid to purchase the CRO Assets, (b) their Qualified Bid should be valued in an amount not less than $2,400,000 and (c) they are entitled to apply the full amount of the Escrow Funds in connection with the Auction; (ii) directing the Debtor to allow the Garretts to bid at the Auction for the CRO Assets; and (iii) granting related relief.

## CONCLUSION

From the moment the Garretts signed the Letter of Intent and agreed to provide a $2.0 million deposit, Medifacts has acted in breach of its express promise to act in good faith to close the transaction. Because Medifacts failed to act in good faith to consummate the transaction as expressly required by to the terms in the Letter of Intent, the Garretts are entitled to use that $2.0 million towards their purchase of the CRO assets. Thus, the Garretts respectfully request that they be deemed a Qualified Bidder under the bid procedures approved by the Court and that their bid be deemed a Qualified Bid.

---

[8] The Garretts reserve all rights to seek whatever relief they are entitled to for breaches of the Letter of Intent and other wrongful conduct by Medifacts, its board, its officers and its preferred shareholders.

| | |
|---|---|
| Dated: Wilmington, Delaware<br>February 28, 2007 | MORRIS, NICHOLS, ARSHT& TUNNELL LLP |

                              */s/ Kevin M. Coen*
                          Robert J. Dehney (No. 3578)
                          David J. Teklits (No. 3221)
                          Gregory T. Donilon (No. 4244)
                          Kevin M. Coen (No. 4775)
                          1201 Market Street
                          P.O. Box 1347
                          Wilmington, Delaware 19899-1347
                          Telephone:    (302) 351-9229
                          Fax:    (302) 658-3989

                          SAUL EWING LLP


                          */s/ Norman L. Pernick*

                          Norman L. Pernick (#2290)
                          222 Delaware Avenue
                          Suite 1200
                          P.O. Box 1266
                          Wilmington, DE  19899
                          Telephone:  (302) 421-6824
                          Fax:  (302) 421-5865


                          Counsel for Drs. Bruce N. Garrett, M.D., and Sandra S. Garrett, Ph.D.

746646.5